Filed 10/7/13  In re A.N. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re A.N. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E056082 |
| Plaintiff and Respondent, | (Super.Ct.No. J242856, J242857, J242858) |
| v. | O P I N I O N |
| L.N. et al., | |
| Defendants and Appellants. | |

APPEAL from the Superior Court of San Bernardino County.  Gregory S. Tavill, Judge.  Affirmed with directions.

Lori A. Fields, under appointment by the Court of Appeal, for Defendant and Appellant L.N.

Jesse McGowan, under appointment by the Court of Appeal, for Defendant and Appellant P.N.

1

Jean-Rene Basle, County Counsel, and Dawn M. Messer, Deputy County Counsel, for Plaintiff and Respondent.

## I.  INTRODUCTION

Defendants and appellants, P.N. (Father) and L.N. (Mother), are the divorced parents of three children, Ad., Z., and Am.  They appeal from orders of the juvenile court declaring the children dependents of the court and removing them from the parents' custody.  They argue that the evidence is insufficient to support the court's true findings as to allegations establishing juvenile court jurisdiction and that the court deprived them of due process when it added a new jurisdictional allegation at the conclusion of the jurisdictional hearing.  The parents also challenge the court's dispositional order removing the children from their custody and placing them in foster care.

We agree with the parents that the court erred in adding a new jurisdictional allegation without providing them an opportunity to present evidence and argument on the issues it raised.  We also agree that several of the jurisdictional findings are not supported by sufficient evidence.  However, two of the court's true findings are supported by substantial evidence, which establishes the court's jurisdiction over the children.  Finally, we reject the parents' challenges to the dispositional orders.

## II.  FACTUAL SUMMARY AND PROCEDURAL BACKGROUND

### A.  *Background*

Father is an attorney; Mother is a teacher master supervisor for a public school district.  They separated in 2006 and divorced in 2008.  They are involved in an ongoing

and contentious family law court case. According to a court-appointed special master, the case has involved more than 70 calls to law enforcement, 12 referrals to plaintiff and respondent, San Bernardino County Children and Family Services (CFS), five psychologists, and several other mental health professionals. One psychologist described the case as "one of the most conflict-ridden cases heard in the Victorville Family Law courtroom," and the family law court special master stated that "family law professionals cite this case as the worst family law case they have ever seen."

In a 2009 psychological evaluation prepared for the family law proceeding, Father is described as having a tendency for "angry outburst[s]," and as being argumentative, impatient, and easily frustrated when his wishes are not gratified. He "has a long history of 'bothering others'" and has been the object of restraining orders issued for the protection of Mother and others. He was twice arrested for violating these orders. He has threatened to sue Mother for slander and other claims and, in e-mails, accused Mother of kidnapping and child abuse. The family law commissioner eventually referred Father to the State Bar for disciplinary action because he "engaged in a pattern of using his status as attorney at law to threaten and harass [Mother]."

In April 2010, Mother and the children moved into a domestic violence shelter for 30 days to avoid what Mother perceived as Father's physical and emotional abuse toward them. For a period of time thereafter, Father's contact with the children was limited.

Over the course of the family law proceedings, Mother made numerous reports to law enforcement and CFS alleging that Father was abusing the children. The reports

resulted in repeated interviews with the children. A psychologist noted that more than 30 such interviews took place within a seven-month period in 2009. In each case, the referrals and reports were investigated and determined to be unfounded; Mother was eventually declared a vexatious litigant.

A CFS social worker told a psychologist "that it appears the abuse being experienced by the boys is likely to be at the hands of their angry mother, seeking intervention to remove the boys from their father, for seemingly inaccurate allegations." He described the reports as a misuse of the reporting system and possibly abusive to have the children "repeatedly dragged into this interview process." The psychologist stated that Mother's reports are "abusive and disturbing to the children" and concluded that the repeated questioning "is more disturbing and emotionally stressful to the children[] than what ever [*sic*] event they may be rescued from. The children express great distress in fearing the 'police will come to Dad's house again' along with disliking 'having to talk with doctors.'"

In October 2010, the parties were ordered to discuss any concerns regarding suspected child abuse or neglect first with a court-appointed special master, who would assess the need to report suspected abuse. Nevertheless, Mother began calling the police in late 2011 seeking to have Father arrested based on alleged child abuse.

In February 2011, the family court awarded Father sole custody of the children. The special master developed a plan to eventually restore the parents to equal time sharing. Initially, Mother had no contact with the children for two or three months.

Thereafter, she had about three months of supervised visits. Later, she had the children for overnight visits on Wednesdays and on weekends.

In December 2010, Mother began a dating relationship with William W. William W. had been convicted in 1984 of burglary and rape by force. In 2000, he was convicted of assault with intent to commit oral copulation and attempted false imprisonment. Soon after they began dating, Mother learned that William W. was required to register as a sex offender. She was also aware that William W. had been addicted to methamphetamine. Mother and William W. married in 2011.

At some point in 2011, Father learned of William W.'s criminal past and of the requirement that William W. register as a sex offender. The family court ordered that William W. have no contact with the children. Nevertheless, the children told their therapist that William W. had been around them. According to the special master, Mother "feels no need to follow the orders of a system she does not respect [and] will not keep the children away from her husband despite a court order for her to do so."

B. *The February 2012 Detention*

In February 2012, a custody exchange from Mother to Father took place at the Apple Valley police station. At that time, Ad. was 12 years old, Z. was 10 years old, and Am. was 7 years old. Ad. told a deputy sheriff that he was afraid to go with Father. The officer and social workers subsequently interviewed each of the children. Ad. said that Father constantly yells at him in a degrading manner for everything that goes wrong, pushes him in his chest area, and grabs Z. by the back of his neck hard enough to cause Z.

5

pain and make him cry. He said Father once pushed Z. into some cabinets and the refrigerator. Ad. also said that Father's house is infested with cockroaches, spiders, and ants. He was not comfortable living at Father's house because of ongoing verbal, emotional, and physical abuse, and asked the officer to help him get out of the house. Ad. told the social worker that Mother is "'nice to us; . . . she loves us kids, and she treats us with respect.'" He added that Mother's home is clean and they feel safe there.

Z. told the officer that when Father gets angry he pushes him to the ground or grabs his neck. Once, Father grabbed his neck so hard he could not breathe or talk. Z. described the house as dirty and "gross," with ants, spiders, and cockroaches. He said Father yells and cusses at them and calls them derogatory names. Mother, Z. said, is the exact opposite of Father; she does not yell at them and does things with them.

Am. told the officer that Father yells at her, his house is dirty, and she does not like living there.[1]

When social workers attempted to interview Father, he spoke "in a loud and harsh tone of voice" and repeatedly made defamatory comments regarding Mother. He denied ever physically disciplining the children, accused Mother of manipulating the children and of suffering from depression, and asserted that William W. is damaging the children.

---

[1] The three children also reported that they do not like that Father touches and rubs them on their arms, upper back, and on their upper and inner thighs. When Z. demonstrated this for the social worker, Am. said: "'Yeah, he does that to me too and always tells me that it's normal.'" CFS has not, however, alleged any inappropriate sexual contact between a parent and child in this case.

6

The social workers noted that during the 53-minute interview Father never asked about the well-being of the children or expressed any concern for them.

Based on these interviews, CFS social workers took the children into protective custody.

CFS filed a petition for each child based upon Welfare and Institutions Code section 300, subdivisions (b) (failure to protect) and (c) (serious emotional damage).[2] The section 300, subdivision (b) counts were based upon Mother's depression (count B-1), Father's inappropriate discipline (count B-2), Father's failure to provide adequate housing (count B-3), the parents' inappropriate and harmful representations regarding each other (counts B-4 & B-5), and deterioration of Father's mental health (count B-6). Under section 300, subdivision (c), CFS alleged that the parents' deteriorating relationship has exposed the children to psychological evaluations and interviews with police officers, social workers, therapists, and a special family law master, causing them serious emotional damage (count C-7).

Following a contested detention hearing, the court found a prima facie case for jurisdiction under section 300, detained the children outside the parents' homes, and placed them in the temporary custody of CFS. The court ordered visitation once each week for two hours for each parent.

---

[2] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

C. *Jurisdiction and Disposition*

In a jurisdictional/dispositional report, CFS recommended that the court sustain the petitions and grant custody to Mother with family maintenance services, and that no services be provided to Father. In the report, CFS summarized interviews with the children. Ad. told a social worker that Father's home is "a 'very negative environment,'" because Father "'always screams and yells'" at the children and "the house is 'dirty and depressing'" with "'bugs, spiders, and clothes everywhere.'" Father also treats the children "'like dogs,'" and calls them "'rotten children, idiots, and fucking bitch.'" Father will put his hand on Ad.'s neck to guide him outside to do chores and has pushed Z. into cabinets, causing Z.'s head to hit the cabinets. Father "constantly blames" the children and Mother "for all of his problems, and makes threats to [the children] about not seeing [Mother]." Regarding Mother, Ad. said that "'she's nice and . . . respects us.'" He would like to live with her and have supervised visits with Father.

Z. told the social worker about an incident in which Father grabbed his neck, causing him to have "'a pounding feeling in [his] head because of the pressure.'" He added that Father frequently grabs him by the back of the neck, squeezes, and guides him around the house. Father will scream and yell at the children, and call them names, such as "'retarded, stupid children, and son of a bitch.'"

Am. said that Father "is 'sometimes mean to her'" and "says 'bad words'" to the children. She has seen Father "'grab [Z.] by the neck a lot.'"

8

Regarding Father, CFS reported that Father has, throughout its investigation, "demonstrated anger, hostility, bitterness, and a vehement disregard for the emotional wellbeing of his children. Additionally, [he] takes no responsibility for his role in having [the children] placed in protective custody[,] stating on multiple occasions 'this is entirely [Mother's] fault.'" Father informed the social worker that "there is 'nothing wrong with my mental health, or the way I treat my children,' and he does not 'see the benefit' in further services." The social worker concluded that Father's "unpredictable and unstable behavior appears to be escalating in frequency and magnitude over the years," and that he may "be a danger to his children, [Mother], and the various professionals in his life."

Mother was "cooperative" with CFS and appeared willing to "'do whatever is necessary' to have her children return to her home." However, CFS expressed concern that Mother minimized the seriousness of her role in contributing to the emotional instability of the children and her relationship with William W.

Near the outset of the contested jurisdictional and dispositional hearing, CFS moved to amend the petitions to add a new allegation B-8 (count B-8) under section 300, subdivision (b) based upon the "parents' dysfunctional interpersonal relationship and escalating power struggle," which has exposed the children "to a family environment of continuous dysfunction, violence and emotional abuse." There was no objection to the proposed amendment. The court granted the motion.

Dr. Michele Martin, a therapist for the children, provided a report and testified at the hearing. In her report, Dr. Martin opined that the children "are suffering because they

9

are continually forced to choose sides in their parents' conflict by reporting on one another, or seeing one parent in a more favorable light than the other." Although the children told Dr. Martin they prefer Mother's parenting over Father's and would like to live with Mother, Dr. Martin said this decision is without full knowledge of potential dangers in Mother's home—an apparent reference to William W. If the parents continue to "battle," she concluded, "they will eventually lose emotional connections with the children as the children distance themselves from the parents in order to avoid the turmoil."

Dr. Martin testified that the children spoke to her about "rough handling" at Father's house, such as when Father grabs them by the neck and arm, but she did not believe there had been any physical abuse. However, she opined that the children are suffering from emotional abuse. In particular, Dr. Martin testified that Ad. has been subjected to emotional abuse and maltreatment as a result of being parentified and held to "very high," perfectionistic standards for himself. Dr. Martin further stated that the children believe Father has extremely "high expectations" for them. The children are excellent students, but if they perform "less than the best," Father will use profanity and tell them they are "stupid, things like that." She also testified that Father will lose his temper and shout at the children, which rises to the level of abuse because of the length of time the children experienced it.

When asked about risks of returning the children to Mother, Dr. Martin said that, "emotionally, it's the ongoing battle and the feeling of the triangulation that happens, the

10

feeling of having to take sides against one or the other parent." There is also the risk posed by William W.'s presence in Mother's home; that is, the risk that the children can be sexually abused or groomed for abuse if he is not rehabilitated. For these reasons, she did not think it was appropriate to place the children in Mother's care.

Dr. Martin believed there was a risk of returning the children to Father because of "the ongoing triangulation and the battle and choosing of sides." In addition, "[t]here is the anxiety that [the children] feel around him, never quite knowing when he's going to become angry or when they're going to displease him, and he's going to be rough toward them."

Dr. Martin explained that while there is often triangulation in contested divorce cases, this is not a "normal family law case." The level of emotional abuse in this case, she concluded, rises to the level of abuse necessary to establish dependency court jurisdiction under section 300. She believed that if the children are returned to either parent's home they will continue to suffer emotional abuse. As a result, they could grow up to be less trusting of others and less able to have close, intimate relationships.

Following Dr. Martin's testimony, CFS informed the court and parties that it was changing its dispositional recommendation to providing reunification services to both parents rather than placement with Mother on family maintenance status.

Mother called Leslie Carey to testify about William W. Carey, an employee of the Department of Corrections and Rehabilitation and a clinical social worker with a parole outpatient clinic, described William W. as a "client." He recalled that William W. had

11

been convicted in the 1980's of rape by force and, in 2002, of attempted oral copulation. In both cases, the victims were adult females. The more recent charges also involved assault with a deadly weapon. William W. had never shown any interest in prepubescent children. Carey considered the risk of William W. sexually offending the children to "be on the low side." He later explained that William W. is "less of a risk" in the context of the people he works with, and "would be a moderate risk" when compared to the general population. He further described William W. as "fairly well rehabilitated," but added that "there is still room for rehabilitation." He would "absolutely not" recommend that William W. be in a position of caring for children, such as in a day care environment.

Mother testified that she believed William W. had been rehabilitated and was not a risk to the children. However, she said that she would terminate her relationship with William W. and have no contact with him if necessary to get custody of her children.

Mother further testified that she believed Father has physically and emotionally abused the children, and the children would continue to suffer abuse if they are returned to his care. She explained that "the emotional abuse is severe because it causes [the children] to regress and to check themselves all the time"; they feel they have "to be perfect" and cannot be "normal kids." In addition, "[Ad.] has become the parent" to the other children.

Mother said she agreed with Dr. Martin's opinion that the parents have escalated their custody battle to the point where it has caused emotional harm to the children. When questioned by the court on this point, she agreed that their conflict has "been

12

causing damage and detriment to [the] children." She further agreed that the repeated interviews of the children over the years have been "detrimental to the children."

Father testified that the children were never in any physical danger from him. He denied having perfectionist ideals, cursing at the children, calling the children names, or blaming Mother in the children's presence. He also denied reports that he has explosive outbursts and uncontrollable conduct. The children's complaints about him, he asserted, are falsehoods induced by Mother, that all of the problems the children have experienced are caused by Mother, and his actions have had no effect on the children's feelings of depression and anxiety.

When Father was asked if he believed the children have been emotionally harmed by the actions of both parents, he said: "They have been stressed, yes. I don't know if it gives rise to significant emotional distress or damage, but they have been stressed." When asked why the children say they have less stress and anxiety in foster care, Father explained that it is because they are no longer exposed to the escalation of stress caused by Mother.

Following the close of evidence and argument by counsel, the court granted CFS's motion to dismiss count C-7 and, sua sponte, added two new allegations to the petitions to conform to proof. New allegation B-10 (count B-10) provided: "The children are at substantial risk of harm due to Mother's relationship with Mr. [W.], a person twice convicted of sexual offenses committed by force[,] who has a history of methamphetamine addiction. And based on Mother's demonstrated lack of

13

understanding of the risk factors associated therewith, the children are at risk." New allegation C-9 (count C-9) provided: "The [F]ather's demand for perfection from the children places the children at substantial risk of serious emotional damage." The court did not ask the parties to address the new allegations.

The court found true counts B-2 (Father's inappropriate discipline), B-3 (failure to provide adequate housing), B-4 (Father's inappropriate and harmful representations), B-8 (exposing children to environment of dysfunction, violence, and emotional abuse), B-10 (Mother's relationship with William W.), and C-9 (emotional harm due to Father's demand for perfection). The court found not true count B-6 (Father's deteriorating mental health) and dismissed counts B-1 (Mother's depression) and B-5 (Mother's inappropriate and harmful representations).

In making its findings, the court provided the following comments:

"It is the Court's observation that both parents have a long history of allowing, causing, and facilitating harm to their children.

"It is clear to the Court that both parents are justified in their criticisms of the other, but that neither is blame-free for the circumstances that present themselves to the Court today. They have both damaged and caused detriment to their children.

"It is also clear to the Court that if the children were placed with either parent, the children would be at risk.

"It's the observation of the Court, and the belief of the Court based on the evidence, that the [F]ather's physical handling of the children is abusive when considered

14

with the verbal discipline and in light of the [F]ather's willingness to use the kids to get back at the mom.

"It's not the one momentary incident by itself, but the repeated pattern of physical discipline in the context of the lives that the children are forced to live that creates the problem.

"The levels of anxiety that the children have over the perfection issues does appear to the Court to be severe and prolonged and problematic for children.

"Certainly, the level of damage to the children is in proportion to their age. The older child is most severely affected. The youngest child is the least severely affected. But it is predicted that as the youngest child . . . grows, that the level of impact on her, unless things change, will be severe.

"The court believes that the [M]other's statements that she will be protective of the children regarding Mr. [W.] while appearing sincere are not believed by the Court.

"Mr. [W.] is a danger to the children. He presents a risk that is not acceptable or appropriate. The Court does not believe that the [M]other is presently able or willing to protect the children from Mr. [W.]."

The court declared the children dependents of the court, removed them from the parents' custody, and ordered reunification services for the parents. Each parent appealed.

## III.  DISCUSSION

A. *Sufficiency of the Evidence Supporting the Court's Jurisdictional Findings*

### 1.  Standard of Review

In reviewing a juvenile court's jurisdictional finding, we apply the substantial evidence test.  (*In re P.A.* (2006) 144 Cal.App.4th 1339, 1344; *In re David M.* (2005) 134 Cal.App.4th 822, 828.)  We "must accept the evidence most favorable to the order as true and discard the unfavorable evidence as not having sufficient verity to be accepted by the trier of fact.  [Citation.]"  (*In re Casey D.* (1999) 70 Cal.App.4th 38, 53.)  Under this standard, the juvenile court, not this court, assesses the credibility of witnesses, resolves conflicts in the evidence, and determines where the weight of the evidence lies.  (*Id.* at pp. 52-53.)  "We affirm the rulings of the juvenile court if there is reasonable, credible evidence of solid value to support them.  [Citations.]"  (*In re Matthew S.* (1996) 41 Cal.App.4th 1311, 1319.)

### 2.  Count B-2:  Risk of Physical Harm from Father's Inappropriate Discipline

Under count B-2, CFS alleged that the children have suffered, or there is a substantial risk they "will suffer, serious physical harm or illness" because Father "uses inappropriate discipline, which places the children . . . at substantial risk of serious physical harm, as evidenced by, but not limited to:  [¶]  . . . pushing the children into

16

furniture and appliances[; and] [¶] . . . grabbing the children by the neck and squeezing so hard the children cry."**3**

The record discloses several instances of physical aggression by Father toward the children. There are numerous reports indicating that Father has squeezed Z.'s neck on numerous occasions, sometimes causing him pain and difficulty breathing or talking. He has also put his hands around Ad.'s neck to guide him, pushed Ad. in the chest, and pushed Z. to the ground and into cabinets and the refrigerator. Z. told a social worker that Father grabbed his "neck so hard that it 'left a red mark, but it faded over time.'" He said his head was pounding because of the pressure. Father reportedly explained to Z., "'if you can hurt [Am.], why can't I hurt you?'" Once, when Father pushed Z. onto a tile floor, Z. got "a small red mark on his wrist." Z. has also described an incident in which Father rolled him up inside a rug, which made the child feel suffocated, and another time when Father wrapped him up inside the netting of a Christmas tree, which "hurt really bad."

---

**3** The "B" allegations in the petitions are asserted under section 300, subdivision (b). This section provides for juvenile court jurisdiction when a child "has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child, or the willful or negligent failure of the child's parent or guardian to adequately supervise or protect the child from the conduct of the custodian with whom the child has been left, or by the willful or negligent failure of the parent or guardian to provide the child with adequate food, clothing, shelter, or medical treatment, or by the inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse."

The instances of Father's physical aggression might not, by themselves, rise to the level of serious physical harm for purposes of section 300, subdivision (b). However, we review Father's actions, as the court viewed them, together with evidence of Father's history of unpredictable anger and his verbal and emotional abuse of the children.

The record is replete with reports of Father frequently screaming and yelling angrily at the children, cursing, and calling them derogatory names, such as "stupid," "idiots," "rotten children," "retarded," "fucking bitch," and "son of a bitch." Social workers reported that Father has "demonstrated anger, hostility, bitterness, and a vehement disregard for the emotional wellbeing of his children." Dr. Martin stated that Father's "repeat episodes of aggression are out of proportion to the stressors" and may indicate "Intermittent Explosive Disorder." Moreover, social workers noted that Father's "unpredictable and unstable behavior appears to be escalating in frequency and magnitude . . . ." Father, they concluded, "may indeed be a danger to his children . . . ."

Significantly, Father appears unwilling to acknowledge that his behavior has been inappropriate or harmful to the children. He denied cursing at the children, calling them names, or the reports of angry outbursts. He denied ever physically disciplining the children and told social workers there is "'nothing wrong with . . . the way I treat my children . . . .'" Because Father sees nothing wrong with squeezing his child's neck to the point where the child has trouble breathing, there is a substantial risk he will repeat this dangerous conduct with more harmful consequences next time.

When Father's history of aggressive physical handling of the children is taken together with the evidence of verbal abuse toward the children, the reports of unpredictable and increasingly hostile behavior, and his insistence that he has done nothing wrong, the court could reasonably conclude that there is a substantial risk of serious physical harm to the children for purposes of section 300, subdivision (b).

Father provides an extensive review of the numerous reports of physical abuse over the years and emphasizes that therapists and social workers have repeatedly and consistently found that Father had not physically abused the children and that such reports were unfounded. However, even if the previous instances of physical aggression did not amount to severe physical harm, the court could still find it had jurisdiction if all the circumstances establish a substantial risk that the children will suffer physical harm. (§ 300, subd. (b); see, e.g., *In re J.K.* (2009) 174 Cal.App.4th 1426, 1439 [court considered the fact that the father had not taken steps to address his physical abuse and made no genuine effort to cooperate with the child protective agency].) In addition to the evidence of Father's physical aggression toward the children, the court also received evidence that Father's anger and hostility has increased and that Father refused to acknowledge the problem or change his ways. When all these circumstances are considered, there is sufficient evidence to support the finding that there was a substantial risk of physical harm.[4]

---

[4] Because we affirm the court's jurisdictional finding on count B-2, we could decline to consider the challenges to the remaining jurisdictional findings. (See *In re Drake M.* (2012) 211 Cal.App.4th 754, 762 [if any one ground for jurisdiction is

*[footnote continued on next page]*

19

3. Count B-3:  Risk of Physical Harm or Illness from Father's Unsanitary House

In count B-3, CFS alleged that there was a substantial risk the children would suffer serious physical harm or illness due to Father's failure to provide adequate housing.  In particular, CFS alleged there was a lack of clean living space for the children in the home and the presence of live roaches and other bugs throughout the home.  Father contends the evidence is insufficient to support the court's finding the allegation true.[5]

There is ample evidence supporting the allegation.  Ad. told a sheriff's deputy that there were cockroaches, ants, and spiders in Father's house, and that Father's response to Ad.'s complaint was that "it is their house too, it[']s nature."  Ad. told a social worker that "the house is 'dirty and depressing'" and said "'there are bugs, spiders, and clothes everywhere.'"  Z. also told the deputy there have been cockroaches and spiders in the bathroom and in their bedrooms and described conditions in the house as "dirty and gross."  Am., the youngest, has also seen bugs and spiders and described the house as dirty.  A search by law enforcement "found that the home did have roaches and that there were large amounts of clutter in all rooms, with some rooms being extremely marginal."

*[footnote continued from previous page]*
supported by substantial evidence, the reviewing court need not consider whether any or all of the other alleged grounds are supported by the evidence]; *In re I.A.* (2011) 201 Cal.App.4th 1484, 1493 [when one basis for juvenile court jurisdiction is upheld, court has discretion to consider alternative jurisdictional findings].)  However, we will exercise our discretion to consider the alternative grounds because they serve as a basis for the dispositional orders challenged in the appeal and could potentially impact the dependency proceedings going forward.  (See *In re Drake M., supra,* at pp. 762-763.)

[5]  Mother does not challenge the sufficiency of the evidence to support the court's jurisdictional findings under counts B-2 and B-3.

20

Based on such evidence, the court could reasonably conclude that the home as described was extremely unsanitary and posed a substantial risk of physical harm or illness to the children.

Father points out that social workers visited the home after the dependency petitions were filed and "observed that the home appeared to have been cleaned up based on the photos that were taken by the . . . Sheriff['']s Department. The home still appeared to be cluttered, but was free of safety concerns. No bugs or other infestations were observed in the home . . . ." However, notwithstanding Father's efforts to clean the house, the court could reasonably conclude that without juvenile court jurisdiction to protect the children, the house would return to its unsanitary state. We therefore conclude the evidence is sufficient to support count B-3.

4. Counts B-4 and B-8: Risk of Physical Harm or Illness from Father's Representations About the Parents and the Parents' Dysfunctional Relationship

Under count B-4, CFS alleged the children have suffered, or there is a substantial risk that they will suffer, serious physical harm or illness because Father "engages the children . . . in inappropriate and harmful representations of historic events in regards to the primary caretakers, which causes emotional detriment and places the children at risk as evidenced by, but not limited to: [¶] . . . dividing [the] children's loyalties among caretakers[; and] [¶] . . . creating negative emotions and accounts regarding [Mother]."

Under count B-8, CFS alleged: "Due to the parents' dysfunctional interpersonal relationship and escalating power struggle, the children have been exposed to a family

21

environment of continuous dysfunction, violence[,] and emotional abuse. As a result of this behavior by the parents, the children have suffered emotional problems and will continue to suffer chronic emotional problems in the future."

The parents point out that the factual basis for these allegations is alleged *emotional* harm. However, section 300, subdivision (b) requires proof the children have suffered, or a substantial risk they will suffer, serious *physical* harm or illness; it is not enough to show emotional harm. They are correct. "Subdivision (b) means what it says. Before courts and agencies can exert jurisdiction under section 300, subdivision (b), there must be evidence indicating that the child is exposed to a *substantial* risk of *serious physical* harm or illness." (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 823.) As stated in *In re Daisy H.* (2011) 192 Cal.App.4th 713, 718: "Neither section 300, subdivision (a) nor (b) provides for jurisdiction based on 'emotional harm.' Subdivisions (a) and (b) state that the court may adjudge a child a dependent of the court if '[t]he child has suffered, or there is a substantial risk that the child will suffer, serious *physical* harm . . . .' (Italics added.) Nor does any other provision of the dependency law support jurisdiction on the ground of 'emotional harm.' The court had no authority to assert jurisdiction on grounds not contained in the code."

CFS contends the parents waived this argument by failing to raise it below. We disagree. "'Generally, points not urged in the trial court cannot be raised on appeal. [Citation.] The contention that a judgment is not supported by substantial evidence, however, is an obvious exception to the rule.'" (*In re Brian P.* (2002) 99 Cal.App.4th

22

616, 623; see also *In re M.B.* (2010) 182 Cal.App.4th 1496, 1506 [Fourth Dist., Div. Two] ["a claim that there is insufficient evidence to support the judgment is not waived by a failure to object"], fn. omitted.) Indeed, a challenge to the sufficiency of the evidence to support a court's jurisdictional finding is not waived on appeal even when the party submits the jurisdictional issue on the basis of the social worker's report. (*In re T.V.* (2013) 217 Cal.App.4th 126, 136; *In re N.M.* (2011) 197 Cal.App.4th 159, 167; *Rosa S. v. Superior Court* (2002) 100 Cal.App.4th 1181, 1186.)[6] The argument has not been waived or forfeited.

CFS presents no argument on appeal as to the merits of the parents' claims regarding counts B-4 and B-8, and points to no evidence that supports a finding that the conduct alleged in those counts caused the children to suffer, or created a substantial risk they will suffer, serious *physical* harm. Accordingly, the court's finding as to these counts must be reversed.

5. Count B-10: Mother's Relationship With William W.

As noted above, count B-10, concerning the alleged risk of harm to the children from Mother's relationship with William W., was added by the court sua sponte following closing arguments. The parents contend that the amendment violates their

---

[6] The cases CFS relies on for its waiver argument are not on point. *In re Aaron B.* (1996) 46 Cal.App.4th 843 and *In re Crystal J.* (1993) 12 Cal.App.4th 407 involved challenges to the adequacy of adoption assessments, not jurisdictional findings. (*In re Aaron B., supra,* at p. 846; *In re Crystal J., supra,* at p. 411.) *Association for Protection etc. Values v. City of Ukiah* (1991) 2 Cal.App.4th 720 involved a neighborhood association's challenge to a city's failure to make certain findings in connection with the approval of a site development permit. (*Id.* at p. 737.)

23

right to due process and, if we reach the merits, the evidence is insufficient to support the court's true finding on the allegation. CFS argues that the parents waived any objection to the amendment by failing to object and that the evidence is sufficient to support the finding.

We first address CFS's waiver argument. No one made any objection to the court's amendments. As CFS asserts, "a parent's failure to object or raise certain issues in the juvenile court prevents the parent from presenting the issue to the appellate court." (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1338-1339.) However, the "rule is not automatic" and a reviewing court has discretion to excuse the failure to raise an issue in the trial court "in cases presenting an important legal issue." (*In re S.B.* (2004) 32 Cal.4th 1287, 1293.) Moreover, issues may be raised on appeal when objecting would have been futile (*M.T. v. Superior Court* (2009) 178 Cal.App.4th 1170, 1177), or when the error is a "'noncurable defect of substance where the question is one of law' . . . . [Citation.]" (*Woodward Park Homeowners Assn., Inc. v. City of Fresno* (2007) 150 Cal.App.4th 683, 712.)

Here, following the submission of evidence and the arguments of counsel, the court stated: "In the dependency court, the Court is permitted to change allegations, add allegations, rewrite allegations to conform to proof. [¶] The Court is going to add a B-10 allegation." The court then read its new B-10 count and the new C-9 count and proceeded immediately to announce its findings on the allegations.

24

In response to CFS's waiver argument, Father asserts that he "had no reasonable opportunity to raise the issue." "In announcing its ruling, the juvenile court added count b-10 without warning, and without reopening the matter for further argument. . . . At this point—with the matter submitted and the juvenile court having the floor, so to speak—an objection to the juvenile court's authority to add count b-10 was unrealistic." Mother argues that the "time for objections had passed, and the court set forth its amendment, consisting of count b-10, *as part of its ruling*." Any objection at that point, she asserts, would have been futile.

Based on our review of the record, the parents' perception that they were, in essence, ambushed by the court's sua sponte amendment seems justified. By waiting until all parties had completed arguments on the pleaded counts and had submitted the matter for decision, and by announcing that the court can and "is going to add a B-10 allegation," the court effectively precluded any discussion on the matter. For this reason, and because of the important rights involved, we hold that the failure to object to the court's sua sponte amendment was not waived or forfeited. We will therefore consider the parents' arguments on this point.

In juvenile dependency proceedings, as in civil proceedings, amendments to conform to proof are generally permitted and, indeed, are favored. (*In re Andrew L.* (2011) 192 Cal.App.4th 683, 688-689; *In re Jessica C.* (2001) 93 Cal.App.4th 1027, 1042.) However, amendments to conform to proof should not be allowed when they raise new issues which the adverse party had no opportunity to defend. (*Trafton v.*

25

*Youngblood* (1968) 69 Cal.2d 17, 31; see also *In re Jessica C., supra,* at p. 1042 [an amendment should not be allowed if "the pleading as drafted prior to the proposed amendment would have misled the adversarial party to its prejudice."].) If such an amendment is proposed, the court should, if it is to allow the amendment, permit the adverse party to introduce additional evidence on the new issues. (5 Witkin, Cal. Procedure (5th ed. 2008) Pleading, § 1212, pp. 645-646.) "It is error in that case to allow the amendment and render judgment without a further hearing." (*Id*. at p. 646.)

Here, the jurisdictional allegations in the original dependency petitions were based upon: (1) Mother's depression and use of Xanax; (2) Father's inappropriate discipline, pushing, and grabbing; (3) Father's failure to provide adequate housing; (4) Father's and Mother's inappropriate and harmful representations regarding each other; (5) Father's deteriorating mental health; and (6) the parents' deteriorating relationship, which exposed the children to interviews with law enforcement, social workers, and therapists. There is nothing in the petitions to put the parents on notice that jurisdiction might be based on William W. or his relationship with Mother.

In the jurisdictional/dispositional report, CFS indicated it was aware of Mother's marriage to William W. and William W.'s sex offender status, but appeared to be satisfied that Mother had "a plan to take care of the perceived risk of Mr. [W.] toward [the children]." Under this plan, William W. would not live in Mother's home, not have any contact with the children, and Mother would file for divorce by a certain date. Because CFS had knowledge of William W.'s past and his sex offender status and still

26

did not seek jurisdiction on that basis, the parents could reasonably believe that William W. was not going to be a material issue in determining jurisdiction.

At the jurisdictional/dispositional hearing, CFS moved to amend the petitions by adding count B-8 (concerning the parents' dysfunctional relationship), which the court granted. In doing so, CFS did not mention William W. CFS then concluded its case-in-chief without any indication that it intended to seek jurisdiction based on facts pertaining to William W.[7]

After Father's counsel questioned Dr. Martin during Father' defense case, CFS informed the court and parties that it was changing its recommendation regarding disposition. Instead of having the children placed with Mother on family maintenance status and providing no services for Father, it would recommend reunification services for both parents. CFS did not specify the reason for the change other than to say it was made in consideration of Dr. Martin's report and testimony. Among other matters, Dr. Martin testified that she believed it was not appropriate for the children to be placed in Mother's care because of William W.'s presence in the home. Although CFS was changing its recommendation regarding disposition, it did not indicate it was seeking jurisdiction based on concerns about William W. Indeed, CFS *never* sought juvenile court jurisdiction over the children based on William W.; the amendment to the petitions was entirely the court's doing.

---

[7] CFS called no witnesses during its case-in-chief. CFS merely submitted its jurisdictional/dispositional report and Dr. Martin's report. Dr. Martin was called to testify by Father.

In response to CFS's change in its dispositional recommendation, Mother called Carey, the Department of Corrections and Rehabilitation social worker, who testified about William W. (as summarized above). Mother also testified at the hearing regarding William W. However, the court limited her testimony about William W.'s history. When Mother was questioned by her attorney about William W.'s past, the court sustained its own objection under Evidence Code section 352, with the explanation that he did not "want to hear any more about Mr. [W.]. . . . The time that we are taking up on that collateral issue is way too much, and the probative value is way too little." Although the objection and ruling was undoubtedly appropriate in light of the state of the pleadings at that time (when no allegation regarding William W. had been made), restricting Mother's evidence regarding William W.'s history in that manner would not appear to be justified if the belated B-10 count had been in place.

Mother also points to the lack of an opportunity to present evidence regarding William W.'s drug use "or how many years he had been sober in relation to the jurisdictional requirements of section 300." She further states that if she had been given proper notice, "she would have introduced additional evidence to confirm that [William W.] had not been in contact with her children since the family law no-contact order was issued in 2011 and to establish she had never permitted any unmonitored contact with [William W.], for the purpose of rebutting the causation element of section 300, [subdivision] (b)."

Another point must be made regarding the evidence of William W. that was presented as to the dispositional issues. As stated in *Trafton v. Youngblood, supra,* 69 Cal.2d 17: "'It is frequently the case that evidence which is admissible to establish one issue may tend to establish another issue than that for which it is offered, and it is a rule that evidence so introduced is available to establish any of the issues in the case. This rule is, however, limited to the issues *which are to be tried. If the other issue that the evidence may tend to establish is not before the court the evidence must be limited to the actual issue.* The fact of its introduction cannot be used to establish an issue that the parties have not made in their pleadings. *The court would not be authorized to consider it as establishing an issue that was not before it for trial.'* . . . [Citations.]" (*Id.* at p. 32.) Thus, the fact that evidence was introduced regarding William W. as to dispositional issues does not mean that the court could use the same evidence to establish the truth of a jurisdictional allegation that was not asserted at the time.

To summarize: the original dependency petitions did not provide the parents with any notice that William W.'s history or his sex offender status would be an issue in determining dependency jurisdiction; CFS's jurisdictional/dispositional report indicated that William W. would not be an issue regarding jurisdiction or disposition; although CFS changed its dispositional recommendation following Dr. Martin's testimony regarding William W., there continued throughout the hearing to be no reason for the parents to believe that William W. was an issue in determining jurisdiction; and the court failed to provide the parents with an opportunity to address the new allegation. In light of

29

the foregoing, and based on our review of the entire record, we conclude that the court prejudicially erred by adding count B-10.

6. Count C-9:  Risk of Serious Emotional Damage Due to Father's Alleged Perfectionism

At the same time the court amended the dependency petitions to add count B-10, it added count C-9.  This count is based on the allegation that Father's "demand for perfection from the children places the children at substantial risk of serious emotional damage."

Father contends the allegation fails to state a basis for dependency jurisdiction and is not supported by substantial evidence.  We agree.

Count C-9 was made under section 300, subdivision (c), which applies when a "child is suffering serious emotional damage, or is at substantial risk of suffering serious emotional damage, evidenced by severe anxiety, depression, withdrawal, or untoward aggressive behavior toward self or others, as a result of the conduct of the parent or guardian or who has no parent or guardian capable of providing appropriate care."  As stated in *In re Alexander K.* (1993) 14 Cal.App.4th 549, the subdivision "seeks to protect against *abusive* behavior that results in severe emotional damage.  We are not talking about run-of-the-mill flaws in our parenting styles—we are talking about abusive, neglectful and/or exploitive conduct toward a child which causes any of the serious symptoms identified in the statute.  'Abuse' means 'to ill-use or maltreat; to injure, wrong, or hurt.' [Citation.]" (*Id.* at p. 559.)

30

CFS points to the following evidence to support the court's true finding on the allegation: Dr. Martin's testimony that the children were concerned when they could not meet Father's high academic and athletic expectations for them; Mother's testimony that Father causes the children "to regress and to check themselves all the time" and the children "'were becoming more and more solemn and quiet and being hard on themselves'"; and Mother's testimony that she told Father that the children "'need to be kids and express themselves'" and that "'[i]t's okay for them to screw up.'"[8]

We agree with Father that the evidence of his high standards, or perfectionism, amounts to "if anything, . . . a run-of-the-mill flaw in parenting style." Although there is evidence that the children felt pressure to do well in school and in their athletic competitions, there is no substantial evidence in the record to support a conclusion that Father's high standards constituted abusive behavior resulting in severe emotional damage.

In response to Father's argument on this point, CFS contends the evidence regarding the "parents' deteriorated relationship, or protracted custody dispute" would support a jurisdictional finding under section 300, subdivision (c). The problem with this

---

[8] CFS also refers us to the court's conclusion that "[t]he levels of anxiety that the children have over the perfection issues does appear to the Court to be severe and prolonged and problematic for [the] children." The conclusion, of course, is not evidence. CFS also cites to page 12 in the clerk's transcript and to page 66 of the reporter's transcript for the statement that Father's "demand for perfection was so emotionally traumatizing on the children that it was a factor in their desire to no longer live with him and preference for occasional visits." Neither of the record citations, however, support the proffered fact.

argument is that the dependency petitions did not allege such a basis for jurisdiction under subdivision (c); the only subdivision (c) allegation that was found true is the allegation of serious emotional damage (or the risk thereof) based on Father's alleged perfectionism. We cannot affirm a factual finding that was never alleged or made.

B. *Dispositional Order Removing Children from the Parents*

Father and Mother challenge the sufficiency of the evidence supporting the court's dispositional order removing the children from their custody and placing them in foster care. We reject these arguments.

"If a child is adjudged a dependent child of the court on the ground that the child is a person described by Section 300, the court may make any and all reasonable orders for the care, supervision, custody, conduct, maintenance, and support of the child, including medical treatment, subject to further order of the court." (§ 362, subd. (a).) "In such matters, '[t]he juvenile court has broad discretion to determine what would best serve and protect the child's interest and to fashion a dispositional order in accordance with this discretion. [Citations.] The court's determination in this regard will not be reversed absent a clear abuse of discretion.' [Citation.]" (*In re Corrine W.* (2009) 45 Cal.4th 522, 532; see also *In re Jose M.* (1988) 206 Cal.App.3d 1098, 1103-1104.) Such an abuse of discretion may be found when it is based on an erroneous factual finding. (*In re Drake M., supra,* 211 Cal.App.4th at pp. 769-771.) We review the court's factual findings under the substantial evidence standard. (*In re Jasmin C.* (2003) 106 Cal.App.4th 177, 180; *In re Heather A.* (1996) 52 Cal.App.4th 183, 193.)

32

1. Removal of Children from Father

A juvenile court may not order a dependent child taken from the physical custody of a parent with whom the child resided unless the juvenile court finds clear and convincing evidence of certain circumstances enumerated by statute. (§ 361, subd. (c).) In this case, the statutory circumstance relied upon by the court with respect to Father is: "There is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's or guardian's physical custody." (§ 361, subd. (c)(1).)

The evidence that supports the court's true findings of counts B-2 and B-3, discussed above, also constitutes substantial evidence to support the court's removal decision. Specifically, the evidence of Father's physical aggression toward the children, together with the evidence of his increasing hostility and his denials that there is any problem with the way he treats the children, is sufficient to support the court's finding that there is a substantial danger to the children's physical health, safety, protection, or physical or emotional well-being if they were returned to Father's home. Although the children were never seriously injured by Father, the court could reasonably conclude that there was a substantial danger of physical harm.

Moreover, although the evidence was insufficient to establish counts B-4 and B-8 (serious physical harm due to Father's representations about the parents and the parents'

33

dysfunctional interpersonal relationship) because of the absence of evidence of *physical harm*, the evidence regarding Father's behavior toward Mother provides substantial evidence to support the determination that there was a substantial danger to the children's *emotional well-being*. Dr. Martin testified that the children are "suffering from emotional abuse" as a result of both parents' behavior. As to the risk of returning the children to Father, she discussed "the ongoing triangulation and the battle and choosing of sides." There is also "the anxiety that [the children] feel around [Father], never quite knowing when he's going to become angry or when they're going to displease him, and he's going to be rough toward them." She opined that the ongoing emotional abuse will continue if the children are returned to either parent's home. As a result of such abuse, the children could grow up "less trusting, less able to have close, intimate relationships that are satisfactory." Dr. Martin's report and testimony provide ample evidence to further support the court's dispositional order regarding Father.

Father also argues that reasonable means were available to protect the children without removing them from his care. He suggests that the court could prohibit him from any corporal punishment and from discussing the case with the children. However, in light of the evidence regarding Father's uncontrollable outbursts and anger, and his denial of the same, the court could reasonably conclude that such an order would be ineffective.

2. Removal of Children from Mother

At the time CFS took the children into protective custody, Mother was a noncustodial parent. When the juvenile court removes the children from a custodial

34

parent, it must place the children with the noncustodial parent (i.e., Mother) "unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child." (§ 361.2, subd. (a).) Here, the court made that finding. Mother contends the evidence is insufficient to support that finding. We disagree.

CFS relies primarily on the evidence of William W.'s criminal history and Mother's relationship with him. William W. was convicted of forcible rape in 1984 and, in 2000, assault to commit a felony and attempted false imprisonment. The recent offenses involved an attempt to have an adult female orally copulate him and involved the use of a deadly weapon, either a knife or a letter opener. Carey described William W. as "fairly well rehabilitated," but added that "there is still room for rehabilitation." He stated further that he would "absolutely not" recommend that William W. be put in a position of caring for children, such as in a day care environment.

William W.'s status as a person required to register as a sex offender under Penal Code section 290 is prima facie evidence that he presents a "substantial risk of abuse or neglect" to children he resides with. (Welf. & Inst. Code, § 355.1, subd. (d); *In re John S.* (2001) 88 Cal.App.4th 1140, 1145.) Despite a family court order that William W. have no contact with the children, the special master stated that the children have reportedly been around William W. and opined that Mother "feels no need to follow the orders of a system she does not respect [and] will not keep the children away from [William W.] despite a court order for her to do so." Although Mother testified at the

hearing in this case that she would terminate her relationship with William W. in order to regain custody of the children, the juvenile court stated such statement is "not believed by the Court."

William W.'s criminal history, his status as a registered sex offender, Mother's apparent willingness to violate the family court's no-contact order, and the juvenile court's rejection on credibility grounds of Mother's statements she will protect the children from William W. constitute substantial evidence to support the court's finding that placement with Mother would be detrimental to the safety, protection, or physical or emotional well-being of the children. We therefore reject Mother's challenge to the dispositional order.

## IV. DISPOSITION

The juvenile court's jurisdictional order is modified by striking the findings as to counts B-4, B-8, B-10, and C-9. In all other respects, the court's orders are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

KING _____

J.

We concur:

RAMIREZ _____

P. J.

CODRINGTON _____

J.

36